We'll turn to the next case on the docket, which is 20-3907CV, Jeffrey Lax versus City University of New York. And let's see, do we have Mr. Zweig? Yes, Judge, yes, Judge, good morning. Mr. Zweig, and for the appellant, and then we have Taris Sadria. I want to make sure I am pronouncing your name right. I apologize. It's okay, it's Taris Sadria. Yes, I am present. Judge, Ms. Sadria. Okay, and we both hear your audio, which is a good sign. So, Mr. Zweig, you would like to reserve two minutes for rebuttal, I understand. Yes, Judge, thank you. You may proceed. Thank you, Judge. Good morning, Your Honors, may it please the Court. My name is Jonas Zweig, representing the appellant, Professor Jeffrey Lax, seeking reversal of the lower court's grant of summary judgment, dismissing Professor Lax's claims. As we made clear, and as was argued in the briefs, that the lower court's grant of summary judgment should be reversed for the following three reasons. First, Professor Lax's claims are not time-barred under the applicable statutes and limitations, as they are appropriately fully interpreted. Second, triable issues of fact concerning the defendant's violations of Sections 1983 and Title VII preclude a grant of summary judgment. And third, the municipal defendant would be liable for the individual actions of its subject employee pursuant to the guidelines of Monell. To my first point, the lower court, the district court's decision granting summary judgment on the basis of the violation of the statute of limitations was inappropriately decided, given the fact that the district court failed to consider the appropriate extensions of the statute of limitations that should be applied in this matter. The district court is correct that concerning Section 1983 claims the statute of limitations is three years, and for Title VII claims, the statute of limitations applicable would be the claim must be filed with the EEOC within 300 days of the incident giving a rise to the claim there under. Given that Professor Lax filed his claim with the EEOC on August 4th, 2015, his 300-day window would extend backward to October 8th, 2014. Tangentially, any action or any claim of discrimination or hostile work environment that occurred after October 8th, 2014 would inherently, by any rationale, fall within the statute of limitations under Title VII, but more importantly, even those incidents that occurred before October 8th, 2014 would still have the statute of limitations extended for them under the well-established doctrine of the ongoing violation, the continuous violation which extends the statute of limitations. This court explicitly stated in Quinn v. Greenpea Corporation that a continuing violation extends the limitations period for all claims of discriminatory acts committed under an ongoing policy of discrimination, even if those acts standing alone would have been barred by the statute of limitations. The district court relied very heavily on the Supreme Court case, National Railroad Passenger Court v. Morgan. Notably, the Supreme Court in that action did say that discrete acts of discrimination would not serve to extend the statute of limitations. However, Supreme Court defined a discrete act as one that occurs on the day that it happened, and this court has made clear that where seemingly discrete acts constitute a continuous practice and policy of discrimination, the statute of limitations will be extended and delayed until the final act, as this court stated in Boxall v. Brooklyn College and again, City University of New York. The statute of limitations extension under a continuous violation, even for those seemingly discrete acts would apply to those acts outside of the window for 300 days, as this court stated in Cornwell v. Robinson. This court further stated in Cornwell that a continuous violation will be found in one of two scenarios, either where there is objective proof of a specific ongoing discriminatory policy or as is relevant to specific matter, where specific and related instances of discrimination are permitted to continue unremitied for so long as to amount to a policy or practice. That policy or practice need not be formal. Simply allowing the continuation of the policy or practice unremitied is sufficient to establish a policy or practice, as this court held in Fitzgerald v. Henderson, and as was also echoed in Port Authority Police Asian v. Port Authority of New York and New Jersey. The acts of the defendants of CUNY and Mr. Suss amount to a policy, a practice of discrimination, which would extend the statute of limitations beyond a 300 day window as a continuous violation, as is outlined in the record, as is alleged in the complaint, as is made clear in the testimony of the relevant parties. The discriminatory pattern exhibited by Mr. Suss commenced in or around 2011 and continued unabated for years, through 2012, 13, 14, 15, all the way up to the time of filing the complaint with the EEOC. This particular pattern of discrimination was because Mr. Suss believed, and it's stated to Professor Lacks and to other parties, excuse me, that he believed that there were too many Jews on the KCC campus. And as a result, he allowed the continuous policy to attempt to exclude as many observant, obviously practicing Jews as possible. Moreover, beyond the analysis of a classic discrimination claim, where a continuous violation would extend the statute of limitations, Professor Lacks' claims also arise under a theory of a hostile work environment. In a hostile work environment, as the Supreme Court of National Railroad noted, hostile work environment inherently requires a prolonged analysis of the course of events over a series of time. The court stated explicitly, an act contributing to the claim, provided that an act contributing to the claim falls within the filing period, the entire time period of the hostile environment may be considered for the purpose of determining liability. Hostile work environment began in 2011, when Mr. Suss stated that there were too many Jews. In 2012, he refused to interview candidates selected by the personnel and budget committees if they had a Jewish name. In 2013, he prevented members of the college-wide P and B committees from voting on personal decisions. In 2013 and 14 and 15, he refused to allow plaintiff and other openly outward, obvious orthodox practicing Jews from serving on college committees. In 2014, Suss scheduled the interviews of Jewish candidates on Jewish holidays, the 2015 Jewish candidates- Many of the things you're talking about are things that might be hostile to other people, but not necessarily to your client. Hostile environment can't just be noticing that other people of comparable characteristics are being ill-treated or poorly treated. What happened to your client that creates a hostile environment? Your Honor- Beyond isolated comments taking place one per year. Your Honor, Professor Lacks himself suffered a hostile work environment and was discriminated against because he was denied the ability to work on committees where it was customary for professors in his position to be able to do so. He was denied the opportunity to be promoted and only after clawing through an adverse appeal process. Excuse me, but you know, as to the promotion, he, along with everyone else who was unanimously found to be not qualified, was not promoted. And then eventually he was promoted. I don't know how, but he was. So I think it's really odd to say that when the person has been uniformly voted to be unqualified, that it's a hostile work environment unless they're promoted. Respectfully, Your Honor, those findings were themselves tainted as Mr. Suss had altered the committee in violation of the particular sections and guidelines for having those committees, for allowing all associate professors to vote. So the findings were themselves tainted. In addition to the denial of his promotion, Professor Lacks was denied a compensation increase request when other not similarly situated professors who were not openly, obviously, outwardly Orthodox Jews. That was extra contractual, right? I mean that- Correct, Judge. It's almost like an ex quatia payment. That is correct, Your Honor. However, other professors who were, on the face of it, less qualified than Professor Lacks had been given similar compensation increases, which when taken as a cohesive whole- Yeah, but the question that, I thought that there was, to the extent we can cease things in the record, there was no real basis for saying that they were similarly situated, right? Wasn't there one professor who was being recruited by another college? And so that person was offered a retention payment, right? Your Honor, that may have extended to only one of the professors, but there were- Right, but then there was another one. I can't remember. I'm trying to remember all the details, but it seemed to me, as I recall, that each of the people who got higher compensation had some distinct characteristic that was not shared by the plaintiff. So if we don't have people who are similarly situated, you don't have a basis for complaining about that. Your Honor, the appellate's position is that those seemingly discreet issues are all contextual, particularly when considering Professor Loretta Brancacci-Otaris who herself had been subject to numerous complaints of discrimination and bias. And despite the fact that she was similarly situated and less qualified than Professor Lacks, she was granted entitlement to increased compensation when he had not been. Given that there had been adverse employment actions by the refusal to promote the denial of the committee work, the denial of compensation increased requests, there had been a hostile work environment which represented a continuous violation. Moreover, those present triable issues of fact as to the defendant's violations of Section 1983 and Title VII, which would preclude a grant of summary judgment given that these facts are accepted in the light most favorable to the non-movement Professor Lacks. Similarly- Why don't we do this? You've reserved two minutes for rebuttal. If you'd like, you may use some of that time now, or if you'd prefer, you can hold those two minutes for rebuttal. What would you prefer? Respectfully, Judge, I'll hold them for rebuttal. Okay, very good. Thank you, Judge. Why don't we hear from Ms. Saadriyeh? Are you on the line still? There you go. Yes. Your Honor, there are multiple reasons, multiple specific reasons why a plaintiff cannot establish his claims of discrimination and retaliation. First, the bulk of his Title VII claims, including his claims regarding the temporary denial of his promotion and the denial of the extra contractual pay increase of most of his retaliation claims are all barred by the statute of limitations. And he has not pointed to any ongoing policy that would bring these all together under some sort of continuing violation. In fact, the courts have repeatedly stated that specific acts such as the denial of a promotion or the denial of a pay raise, that these are discrete acts that do not fall within a continuing violation, even if they are pursuant to some sort of general discriminatory animus. Second, he cannot establish that he has suffered an adverse employment action. By all accounts, he has had a very successful career at Kingsborough. He is a full professor and chairman of his department. There is no evidence that he is paid any less than other department chairs with similar experience. There's no evidence that he has less responsibility than any other department chair. He was one of only three faculty members who participated in the search for the new college president in 2014. He was a member of the promotion professors subcommittee in the 2014, 2015 school year. So there's really no support for any contention that he was in some way sidelined. And there is really nothing, no actual admissible evidence to support a contention that he was subject to a hostile work environment. There is no contention that he was subject to slurs or harassing incidents in the workplace. He has proffered like a complaints regarding the insertion of religious issues into conversation, but with no effort to specify what was the content exactly of those conversations or how often they happened or how they could have interfered, how they interfered with his work. And a great deal of what he proffers is simply hearsay regarding other people or what has happened to other people that is not really admissible anyway. And with respect to the actions that X complains about, there is also no evidence that would give rise to an inference of discrimination. And even like with respect to the delayed promotion, again, I mean, he was promoted, he in the end, he was promoted the same day that he would have been, it would have been effective if he had been promoted pursuant to the May meeting. And there's nothing to show that the procedural violation of the school's bylaws that occurred in the May meeting was the result of discrimination. Well, surely there's something odd about the fact that he was unanimously deemed unqualified to move up the rung on the professorship ladder. And then he was, and he's arguing that the adverse assessments were cooked or dishonest. And considering the fact that he was then promoted doesn't that suggest that there was something, there was something wrong with the unanimous ruling that he was unqualified unless the school regularly promotes people who are unqualified? Well, the subcommittee that evaluated the candidates in the May meeting, it unanimously found, unqualified, recommended against the promotion of five of the candidates. And so it wasn't, I mean, it wasn't just blacks and it wasn't just Jewish candidates. I mean, one of the Jewish candidates that had, I believe 15 candidates total presented at that meeting. And at least one of them was, who was promoted was an observant Jew. And he has not, there's hasn't, he hasn't presented any evidence that there was anything about that subcommittee. There was, I mean, his testimony was that he believed that those who voted at the time were voting in good faith based on the evidence that they had before him. I believe that he has stated that he thought that some of his work was not included in the file that was before the subcommittee, but he doesn't offer any evidence as to why, how it was that I was compiled or that anything was excluded based on a religious, for religious reasons. And I, so, I mean, I think there hasn't been, A, there hasn't been, with respect to that specific, specific incident, there hasn't been a showing that there was an actual adverse action because in the end he received the promotion that he desired effective at the date that he would have gotten it anyway. He hasn't shown that there was, there was a basis for inferring religious discrimination in the composition of the exclusion of the associate professors from voting. I mean, since there's no showing that the associate professors were all Jewish or that they were more likely to vote for Jewish candidates or anything. And it was in the end, he was permitted, in the end he was permitted to appeal the denial. And then he, there was, he was permitted to, there was, they permitted a revote and he was successful at the revote along with some of the other candidates as well. And yes, and again, and with respect to, and similarly with respect to the extracontractual pay increase that he sought, there is, you know, the CUNY showed that, you know, this is something that was very rarely granted and only under very specific circumstances that he hasn't, that he didn't show he had. And there was no showing that anything in the assignment, I mean, there was no showing that there was disparate treatment in any kind of systematic way in the assignment of committees. I mean, he just said that he, you know, he wasn't assigned to this particular committee that he wanted. But two, on one of them, there were two Jewish people out of a committee of five were assigned. And so it's hard to see how there could be an influence of religious discrimination arising from that. There are no further questions, I will rest on my brief. Thank you. Thank you very much, counsel. Mr. Zweig, you have reserved two minutes for rebuttal if you'd like to add anything. Thank you, Judge. Respectfully, the Apolese reference to other Jewish individuals who may have been situated on committees or various voting boards or promotions doesn't touch the actual matter, but there's a distinct difference between those who are Jewish and those who are outwardly, obviously practicing Orthodox Jews. Professor Lacks and Dr. Jarmusch are the only department chairs who are Orthodox Jews. And they both reported that Suss consistently refused to appoint them to committees that they traditionally would have had access to while at the same time routinely appointing non-Jews. Similarly, the fact that Professor Lacks was able to bring the appeal of his denial of promotion was only after Mr. Suss attempted to thwart Orthodox Jewish faculty from exercising their right to appeal the denial of promotion, which is an unprecedented infringement on the campus. In terms of the adverse action that Professor Lacks suffered beyond the denial of his compensation, the access to committees constitutes an opportunity to increase and improve and further his career trajectory and further enhance his qualifications. And this court has stated in Galabia versus New York City Board of Education that a limitation preventing an individual from obtaining such opportunities is itself alone sufficient to constitute an adverse action beyond the patent fact that denial of compensation is similarly an adverse action. Taken together collectively, Mr. Suss's actions amounted to an attempt to rectify what he saw as a problem being that there were too many Jews on the Kingsborough campus given that his actions constituted an ongoing scheme and pattern of discrimination. The fact that there were numerous discreet acts cannot change the fact that Suss had an ongoing pattern of discrimination spanning years well within the timeframe of the statute of limitations and extended as a continuing violation. And if there are no further questions, we will rest of the brief. Thank you very much to both counsel. We appreciate your arguments today and we will reserve decision.